Grabau, J.
Plaintiffs, Robert C. Ransow and Ellen Ransow (“Ransows”), brought this civil action against defendant, Aetna Casualty and Surety Company (“Aetna”), alleging Aetna violated G.L.c. 93Aand G.L.c. 176D in its handling of the Ransows’ third-party insurance claims against Aetna’s insured, Robert Pegurri (“Pegurri”).
Count I of the Ransows’ complaint alleges that Aetna failed to offer a fair and equitable settlement upon receipt of the Ransows’ G.L.c. 93A demand letter and employed unfair arid or deceptive practices in its handling of Robert Ransow’s (“R. Ransow”) claims. Count II of the complaint alleges that Aetna failed to offer a fair and equitable settlement upon receipt of the Ransows’ G.L.c. 93A demand letter and employed unfair and or deceptive practices in its handling of Ellen Ransow’s (“E. Ransow”) claims. Both counts allege that Aetna acted in bad faith and that its acts were willful and knowing.
Aetna answered, denying liability and, more specifically, asserted that the Ransows failed to state a cause of action upon which relief can be granted under either G.L.c. 93A or G.L.c. 176D, failed to comply with the requirements of G.L.c. 93A, did not suffer damages recoverable under a G.L.c. 93A claim, and finally, that Aetna did tender a reasonable offer of settlement within the time limits of G.L.c. 93A.
PROCEDURAL BACKGROUND
This action arose as a result of the Ransows’ dissatisfaction with Aetna’s handling of the Ransows’ claim against Aetna’s insured, Pegurri. The underlying incident, which gave rise to the Ransows’ claim against Pegurri under his homeowner’s insurance policy, was the accidental shooting of R. Ransow by Pegurri, which occurred in Pegurri’s home on November 25, 1981. As a result of the shooting of Ransow by Pegurri, R. Ransow suffered severe injuries which resulted in his hospitalization, surgery, the removal of his spleen, as well as the permanent lodging of a bullet in his abdominal wall. The Ransows brought a civil action against Pegurri in Norfolk Superior Court (C.A. No. 135791) on February 17, 1982, alleging Pegurri’s negligence as the proximate cause of R. Ransow’s injuries and E. Ransow’s loss of consortium.
Despite settlement offers from both parties which fell within the policy limits, and two conciliation meetings conducted by a conciliator appointed by Norfolk Superior Court at which it was recommended that *351 Aetna settle "within the policy limits, the parties were unable to reach a settlement.[1]
The Ransows’ case against Pegurri went to trial in November 1988. The jury found in favor of R. Ransow and awarded him damages in the amount of $170,000.00 plus interest and costs, which resulted in a judgment of $310,686.39. E. Ransow was awarded $10,000.00 in damages. After calculating the interest and costs, E. Ransow received ajudgmentin the amount of $18,313.13. Execution was issued against Pegunri on January 10, 1989 for the above amounts. Aetna paid the Ransows $300,000.00 on December 19, 1988, representing the limit of Pegurri’s homeowner’s liability policy.
Prior to the Norfolk County jury trial, the Ransows brought the instant G.L.c. 93A action against Aetna, filing their complaint in Suffolk Superior Court on June 16, 1988.
After the Norfolk County jury trial, Pegunri brought an action in Suffolk Superior Court against Aetna (C.A. No. 89-0199) on January 13, 1989, alleging breach of contract, unfair claims settlement practices and bad faith, seeking damages against Aetna for the excess judgment. Pegurri then assigned his claim to the Ransows in exchange for the Ransows releasing Pegurri from personal liability for the remaining judgment. (Exhibit 3.) The Ransows sought to consolidate their previously filed G.L.c. 93A claim with Pegurri’s assigned claims and on March 3, 1989, a motion to consolidate the claims was allowed.
FINDINGS OF FACT
Based on all the evidence I find to be credible, drawing such fair inferences as I find to be reasonable, and resolving questions of credibility where they occur, I find the following material facts:
1. On November 25, 1981, Pegurri negligently shot and wounded R. Ransow in Pegurri’s home with a .22 caliber handgun owned by Pegurri.
2. As a result of injuries suffered in the shooting, R. Ransow was hospitalized at Norwood Hospital from November 25, 1981 through December 8, 1981.
3. As a result of the injuries suffered in the shooting, R. Ransow had his spleen removed, has extensive abdominal scarring, has a bullet permanently embedded in his abdominal wall and must permanently retain steel surgical clips in his abdomen.
4. As a result of his injuries and hospitalization, R. Ransow incurred medical bills totalling $17,068.00.
5. As a result of his injuries, R. Ransow suffered six weeks of total disability, followed by partial disability, and did not return to work until March 8, 1982. He then worked firm March 8, 1982 through May 28, 1982 as a car salesman for European Deliveries, Inc. of Cambridge, Massachusetts. R. Ransow left that position on May 29, 1982, suffering severe back pain as result of his injuries due to the gunshot. He returned to work on August 8, 1982, employed as a car salesman by Bezema Buick Corp. in Norwood, Massachusetts.
6. At the time of the shooting Pegurri was insured under an Aetna homeowners’ policy which carried a liability limit of $300,000.00. (Exhibit 5.)
7. On February 22, 1982, Aetna received notice that a claim had been filed by the Ransows against their insured, Pegurri, as the result of Pegurri’s shooting of R. Ransow, which occurred in Pegurri’s home. (Exhibit 4.)
8. Upon receipt of the Ransow v. Pegurri claim, on or about February 22, 1982, Aetna was aware that R. Ransow had undergone hospitalization and extensive surgery, suffered the loss of his spleen and visible scarring, and was claiming partial disability. (Exhibits 4 & 5.) Aetna was further aware that R. Ransow’s ad damnum, claim was for $400,000.00 and that E. Ransow’s ad damnum claim for loss of consortium was $50,000.00. (Exhibit 5.)
9. J. Walter Darling (“Darling”), the Ransows’ first attorney, filed the original complaint against Pegurri.
10. Aetna retained attorney Vincent P. Cahalane (“Cahalane”) of Sullivan, Cahalane and Doherty in Brockton, Massachusetts, to represent their insured, Pegurri, on the tort claim. (Exhibit 6.)
11. Aetna’s Brockton office handled the Ransow v. Pegurri claim. Claims were reviewed and administered through a hierarchical review structure. At the top of this claims-handling hierarchy were persons with the title of Claim Manager. The Claim Managers were the direct supervisors of the Assistant Claim Managers, who were the direct supervisors of Claim Unit Managers (a.k.a. Superintendents), who in turn were the direct supervisors of Claim Supervisors, who in turn supervised Claim Representatives. At regular intervals claims were reviewed and approved by supervisors.
12. On March 17, 1982, claim representative Donna Blakely (“Blakely”) dictated a “first regular report” on the claim, noting that the reserve on the Ransows’ claim was set at $20,000. This report documents Blakely’s knowledge that R. Ransow was shot in the stomach and was “admitted to Norwood Hospital on the date of the incident and released a few weeks later.” The report further indicates that Blakely had not yet received the doctor’s reports nor medical bills for her file. (Exhibit 5.)
13. Blakely’s March 17, 1982, report notes in its Evaluation: “Medical — est. 5000; Lostwages — est. 5000; Total specials — est. 10,000; FLV[2] — 20,000;. . . CSD[3]— nil. This yields a reserve of 20,000.” Under the section entitled Contribution, Blakely stated that the accident was “Purely caused by our insured.” (Exhibit 5.)
14. On May 25, 1982, Cahalane, the attorney representing Aetna’s insured, Pegurri, sent Aetna a copy of the Rule 29 statement which the Ransows had filed in court. The Rule 29 statement indicated that R. Ransow had incurred medical expenses of $16,347.00 to date, had suffered the loss of his spleen, had required extensive medical treatment and surgery, had suffered and continued to suffer great pain as *352 result of his injuries and was claiming a diminution of his future earnings. (Exhibit 6.)
15. On June 18, 1982, Blakely dictated an Intermediate Report, in which all of the Evaluation estimates were identical to those in the First Regular Report. Blakely reiterated that the chance for successful defense was nil and that the reserve was still $20,000. (Exhibit 7.)
16. A handwritten notation at the end of this June 18, 1982, report was made by Brad Gledhill (“Gledhill”), a superintendent at Aetna at that time, which stated “Donna, this case could have a very high F.L.V.” (full liability value). (Exhibit 7.)
17. The next intermediate report was dictated on September 16,1982 by claims representative Willa Jackson (“Jackson”), and was approved by claim unit manager (aka superintendent) Laurie Marshall Kelliher (“Marshall”). This report reiterated all of the evaluation estimates from the two prior reports, noting that medical bills and income estimates were still not on file. The full liability value remained set at $20,000. and the chance for successful defense was still set at zero. (Exhibit 8.)
18. The September 16, 1982, report includes a notation that the plaintiffs attorney was attempting to bring a claim against the gun manufacturer as a defendant on this claim. Jackson noted that there was no evidence to date that the gun had been faulty. (Exhibit 8.)
19. On November 24, 1982, Attorney Ann Louise Levine (“Levine”), an associate of Attorney Cahalane, sent Aetna a copy of R. Ransow’s answers to interrogatories propounded by the defendant gun manufacturer, Harrington & Richardson (“Harrington”). This document further informed Aetna of the extent of R. Ransow’s injuries and stated that his medical expenses exceeded $16,000. (Exhibit 9.)
20. R. Ransow’s answers to defendant, Harrington’s, interrogatories further indicated that R. Ransow had been confined to bed from December 7, 1981, through December21,1981, and that he continued to suffer from depression, back pain and shoulder pain. (Exhibit 9.)
21. On December 17, 1982, claim representative Jackson sent a letter to independent medical examiner Joseph D. Wassersug, M.D., (“Dr. Wassersug”) confirming an appointment and informing Dr. Wassersug that R. Ransow had suffered the loss of his spleen. Jackson sought Dr. Wassersug’s opinion as to the degree of permanency involved in R. Ransow’s loss of his spleen and whether R. Ransow had reached an end result in his medical treatment for the injuries he’d suffered. Jackson noted that she did not have medical records or bills in her file at that time. (Exhibit 10.)
22. On January 28, 1983, Dr. Wassersug sent Jackson at Aetna a report regarding his examination and opinion regarding R. Ransow’s injuries. Dr. Wassersug stated that, “(i]n addition to the scar in the abdominal wall left by the entrance of the bullet, he also has a long surgical scar from the xiphoid to the umbilicus ... As for the loss of the spleen, it is permanent. . . Patients who have had their spleen removed are more likely to succumb from pneumococcus pneumonia than patients who have an intact spleen.” He further indicated that the, “(bjullet, however, remains lodged in the . . . posterior abdominal wall . . . and may be a source of discomfort . . . patient still complains of soreness in his back on breathing.” (Exhibit 59.)
23. On March 18, 1983, Jackson had dictated an intermediate report on the claim, which report was not approved by Superintendent Marshall. Jackson later indicated, in a report dictated on May 16, 1983, that Marshall had instructed her to obtain the Ransows’ 1981 and 1982 income tax forms in order to determine lost wages. (Exhibit 12.)
24. On May 10, 1983, a committee, which included Gledhill, Marshall, Jackson and BI [bodily injury] Specialist Michael Fallon reviewed the claim. The report from this meeting, signed by the committee members, raised the reserve on the claim to $58,000. The report further stated, ‘Take credit for the $14,000 paid by Blue Cross & Blue Shield. Try to settle for up to the reserve.” The report also indicated a full liability value of $76,000 and a chance of successful defense of 5%. (Exhibit 11.)
25. On May 16, 1983, Jackson dictated an intermediate suit report which indicated a medical indemnity reserve of $58,200 and an expense reserve of $5,000. This report indicated medical expenses on file totalling $13,858.19 and loss (sic) wages of $6,512.94 for total specials of $20,371.13. (Exhibit 12.)
26. The May 16, 1983, report states that, “Defense Attorney’s November 26, 1982 letter included a response to our request for production of documents pertaining to medical bills and reports and loss (sic) wage information.” I find that Aetna had medical reports, bills and lost wages information as of receipt of that November 26, 1982 letter. (Exhibit 12.)
27. Although Aetna had R. Ransow’s medical bills and reports in late November 1982, it did not raise the reserve on this claim until the committee meeting on May 10, 1983. (Exhibit 12.)
28. The May 16, 1983, report states that the chance of successful defense had been raised to 5% based on a comparative negligence defense because both R. Ransow and Pegurri were gun dealers. (Exhibit 12.)
29. A handwritten note at the end of the May 16, 1983, report indicates that the $76,000 FLV [full liability value] and the reserve don’t compute because, “[w]e’re taking credit for $14,000 paid by B/C” [Blue Cross]. (Exhibit 12.)
30. The May 16, 1983, report states that the last demand was $400,000, in the complaint, and that no offer had been made to date. It further states that structured settlement proposals were being prepared. (Exhibit 12.)
31. On September 21, 1983, claims representative Joyce Johnson (“Johnson”) dictated an intermediate *353 suit report, indicating that Johnson had met with Attorney Darling on September 15, 1983, and had offered $38,000, which Darling rejected. Johnson then offered $58,000, which was not accepted by Darling, who said he would present it to his client with advice to reject it. Darling then indicated that his present demand was for $195,000. Johnson’s report states that Darling was unwilling to discuss structured settlements because Johnson’s offer was too low. (Exhibit 13A.)
32. The September 21, 1983, report notes that a third party named Bruce Bradway (“Bradway”) admitted to reloading the gun prior to the shooting and should be sought for contribution. (Exhibit 13A.)
33. On September 23, 1983, Darling wrote to Johnson, informing her that his clients had rejected the $58,000 offer. (Exhibit 16.)
34. On September 29, 1983, Superintendent Marshall wrote a claim review to Johnson stating, in part, that, “I hope we didn’t jump from $38,000 offer to $58,000? Make them come down before you go up.” (Exhibit 14.)
35. Johnson’s December 19, 1983, intermediate regular suit report states that Johnson’s offers to Darling went from $38,000 to $40,000 to $45,000, then to $58,000, the latter two offers as part of structured settlements. (Exhibit 14A.)
36. On December 30, 1983, Marshall wrote a claim review report to Johnson which stated, “We went from $38,000 to 40 to 45 to 58 and attorney is still at $195,000? That’s not negotiation. What does he want?” She further remarked that Johnson should find out what [co-defendant] Harrington was willing to kick in, whether defense counsel had impleaded Bradway, and what further discovery should be undertaken to affirm chances of a contribution from the two codefendants. (Exhibit 15.)
37. On March 12, 1984, Johnson dictated an intermediate suit report which states that the full liability value was still $76,000, and that the reserve was still set at $58,200, which indicates that Aetna was still taking credit for Blue Cross’s $14,000 payment to Ransow. (Exhibit 17.)
38. On April 30,1984, Janet Clark (“Clark”), a direct supervisor of Johnson, wrote a claim review to Johnson stating, “Let Attorney Levine know we are interested in committeeing and ask her for her opinion re: FLV and CSD — we can take it into account when we GOYA[4] or committee.” (Exhibit 18.)
39. On October 18, 1984, Attorney Levine wrote to Paul Joyce (“Joyce”) of Aetna, who had taken over handling of the claim at that time. She discussed the limited likelihood of contribution from either of the co-defendants and the potential negative effect of their presence on the outcome of the case. She further stated that, “[w]e are dealing with a serious and substantial case, one of full liability on the part of your insured.” (Exhibit 19.)
40. On November 5, 1984, Joyce dictated an intermediate suit report which stated that a committee meeting had occurred that day, attended by his supervisor Carl Anderson (“Anderson”) and Superintendent Marshall, at which meeting it was decided that the reserve would be increased to $75,000. Joyce noted that he had dictated a letter to Attorney Levine to seek her opinion as to the full liability value, which opinion he’d review prior to any further negotiations with Ransow. He further stated that, “(t]here appears to be no question that the liability rests 100% with our insured . . . the only thing remain[ing is] a fair and equitable assessment of damages in order to fully resolve and settle this case.” (Exhibit 20.)
41. On December 20, 1984, Attorney Levine responded to Joyce’s request for an evaluation of the liability value of the claim in a letter to Anderson, noting that it was, “[o]ur opinion that the case, tried before a Norfolk County jury, has avalué of approximately $ 120,000, which, when interest is added would make the case worth close to $150,000.” She further stated that, “[a] good settlement of the matter would be in the vicinity of $100,000.” (Exhibit 22.)
42. Levine’s letter outlined R. Ransow’s potential claims for lost earning capacity, total and partial disability, ongoing pain and discomfort, and the extreme pain and fright suffered as result of his injuries. She further discussed the limited likelihood of contribution from either co-defendant Harrington, which had filed for bankruptcy, or co-defendant Bradway, whom Levine deemed judgment-proof. (Exhibit 22.)
43. On December 31, 1984, Attorney Darling wrote Joyce a letter which stated that it had been three months since he [Darling] had provided Aetna with the material they’d requested necessary to the preparation of a new offer. Darling notes that he’d spoken with Joyce on November 13, 1984, and that Joyce had indicated that he needed another two and a half weeks, yet it was now four weeks past that time. (Exhibit 23.)
44. On January 15,1985, an intermediate suit report was prepared by claim representative Sally O’Neill (“O’Neill”) which stated that she was aware that defense counsel [Levine] had valued the case at $100,000. The report noted that she’d offered Attorney Darling various structured settlements of $75,000. (Exhibit 24.)
45. The January 15, 1985, report further notes that Attorney Darling’s demand, “[i]s still at $190,000 (emphasis added) . . . and that he will not decrease his demand.” (Exhibit 24.) This is the first mention of the demand having been lowered from $195,000 to $190,000.
46. At the end of O’Neill’s January 15, 1985, report, her supervisor, Anderson, made certain handwritten comments which read, in part: “Defense counsel advises our probable exposure here is $150,000 with interest [emphasis in original] ... I tend to agree with defense counsel who recommended $100,000 for set *354 tlement here. Dangerous case with $300,000 BI limits!” (Exhibit 24.)
47. On February 13, 1985. Superintendent Marshall wrote a report to O’Neill reflecting another committee review of the case on 2/12/85. Her report stated, in part: “Case committeed (again!) [emphasis in original). Stick with our $75,000 figure . . . Let defense counsel know that unless something changes that’s all there is and we should prepare for trial and file a certificate of readiness when we are in fact ready.” (Exhibit 25.)
48. On February 25, 1985, Assistant Claim Manager George Sakacs wrote a claim review report which stated that, “another committee should be scheduled A.S.A.P. to include Mgr. Crosby and myself. Based on my review of the file I would negotiate between $100,000 and $125,000.” (Exhibit 26.)
49. On March 19, 1985, O’Neill prepared an intermediate suit report which stated that, “Claimant attorney repeatedly states that he is not interested in any structured settlement offer since we are miles apart in terms of settlement value.” It also stated, “Other office personnel feel that the value is greater then $75,000.” (Exhibit 27.)
50. On April 3, 1985, a file review analysis form memorializes a committee review which was attended by Sakacs, Anderson, Marshall and O’Neill. This report indicates that the reserve was raised to $100,000 as result of the meeting. The report further indicates that the last settlement offer was a structured settlement based on $75,000 made on March 19,1985. (Exhibit 28.)
51. On June 6, 1985, O’Neill prepared an intermediate suit report which indicated that the reserve had been increased from $75,000 to $100,000. The report contained the following remarks: “I did meet with attorney Darling in his office in Norfolk, MA. My impression is that he is angry with the company. He stated that the first offer made by the company back in 1982 was for $16,000 and that the next increase was to $27,000, which was maintained for a period of time. He noted that it was not until recently that we’d offered $75,000. He maintains his demand of $190,000. At our meeting I offered $90,000 and he informed me upon calling several days later that his client would not accept the $90,000 offer and he was again demanding $190,000.” (Exhibit 29.)
52. On August 13. 1985, Marshall wrote a claim review memo to O’Neill which stated: “We’re at $90,000, he’s at $190,000. Our top dollar is $ 100,000 — he hasn’t budged. Don’t offer any more until he comes down. We might as well prepare for trial.” (Exhibit 30.)
53. On August 26, 1985, O’Neill prepared an intermediate suit report which stated: “Letter dated 8-15-85 to claimant attorney, I offered lump sum settlement in the amount of $100,000 as our final offer . . . Again, they have not budged from the $190,000.” (Exhibit 31 A.)
54. On October 2, 1985, Marshall wrote a claim review memo to O’Neill which states: “I continue to be comfortable with our value.”
55. On October 7, 1985, Attorney Levine wrote a letter to O’Neill at Aetna which stated that Levine was, “[rjeluctant to file a Certificate of Readiness in a case in which we have absolutely no defense. ” She indicated that it might be, “advisable to request that the matter be assigned for Conciliation.” (Exhibit 32.)
56. On October 23, 1985, Attorney Darling wrote O’Neill informing her that her $100,000 lump sum settlement had been declined by his clients. (Exhibit 33.)
57. On November 12, 1985, O’Neill prepared an intermediate suit report which states that, “Apparently, unless we move from our $100,000 offer we will in fact go to trial. I have discussed with . . . Levine and recommended that she request a conciliation meeting so that we can put our position on line and hopefully set a trial date.” Elsewhere in the report she states that, “(tjhe doctor gives him a total disability of six months.” (Exhibit 33A.)
58. On November 21, 1985, Marshall wrote a claim review memo to O’Neill which states: “OK, have them push for trial. Unless something changes I don’t want to see this file 'til they pick a jury.” (Exhibit 34.)
59. On January 16, 1986, O’Neill prepared an intermediate suit report which indicated that a conciliation meeting had been scheduled for January 17, 1986, but that defendant Harrington had reminded the court that they were proceeding in Bankruptcy Court and had petitioned for cancellation, which was granted. It further noted that unless Attorney Darling agreed to dismiss his action against Harrington there might be no further developments in terms of litigation. (Exhibit 34A.)
60. The January 16, 1986, report notes that, “Loss of consortium claim for the wife is included in the evaluation as the claimant’s doctor notes that he was unable to have sexual relations with his wife for a period of five months.” (Exhibit 34A.) This is the first mention of E. Ransow’s consortium claim in any internal Aetna documents prepared to date.
61. On March 6, 1986, claims representative Lisa Valade (“Valade”) dictated an Intermediate Suit Report which states, in part that, “At the last committee review it was decided that a $100,000 offer would be our final offer, with the attorney’s demands still study (sic) at $190,000.” Valade notes further that “Our options at this point appear to be ... a. make another offer and attempt to negotiate toward settlement. . . b. stand by our final offer and wait for trial... I have discussed [this) with Supv. Anderson and we have agreed that a committee would be in order regarding what our standpoint will be on this case.” (Exhibit 35.)
62. On April 7, 1986, Marshall wrote a claim review memo to Valade which states, in part, “Would they agree to arbitrate? Seems the only question is $. Why *355 do we have to have another committee review. We are all agreed on value and nothing has changed. Let him try it.” (Exhibit 36.)
63. On August 28, 1986, Valade dictated an Intermediate Suit Report which stated, in part, “I have notified Defense counsel [Levine] and asked her opinion regarding arbitration on our portion of the case ... She said she would be thinking about it, and would get back to me with her thoughts on the subject." Valade noted under items pending, “Follow up with Levine regarding arbitration.” (Exhibit 36A.)
64. On September 11, 1986, Attorney Levine wrote to Valade at Aetna stating that she, “felt it would be a mistake to refer the matter to arbitration,” noting that it was her firm’s “(bjelief that if the case [were] submitted to arbitration the damages awarded [would] be at least the $190,000 demanded . . . and quite possibly, considerably more.” (Exhibit 37.)
65. On November 12, 1986, Valade dictated an Intermediate Suit Report which stated, in part, “Defense Counsel does not recommend that we arbitrate and it will be years before this case does come to trial.” At the end of this report are handwritten notations by Anderson including: “Atty. won’t budge from $190,000 demand. Case is not worth that... $100,000 is our final offer... Not much we can do except try it!” (Exhibit 37A.)
66. On November 25, 1986, Attorney Darling wrote to Valade at Aetna stating, “My clients . . . have instructed me to take affirmative steps to conclude this matter, if possible. They are prepared to settle for a lump sum of $130,000.00.” (Exhibit 38.)
67. On February 11, 1987, Valade wrote a note to her Pegurri/Rand claim file which stated: “Atty. Darling has called me re: his new demand . . . told him our previous offer of $100,000 is final as per supu and supt.” (Exhibit 39.)
68. On February 26, 1987, Marshall wrote a claim review memo to Valade stating: “Demand is 130,000 our offer is 100,000 and I do not want to increase it . . . We have got to motivate plaintiffs counsel to accept our generous offer!” (Exhibit 40.)
69. In her April 10, 1987, Intermediate Suit Report, Valade notes: “We have since learned the attorney has decreased his demand from $190,000 to $130,000. After noting this to the Superintendent, we have decided we would maintain our $ 100,000 offer. This was conveyed to the attorney. .. Again, we are pushing for trial, although this will be a very long hold-up due to the bankruptcy of the Gung (sic) Company... Defense Counsel remarks that matters concerning this suit must be stayed until the bankruptcy petition by [Harrison] . . . are resolved.” She later notes that, “[t]his is the first evidence by Attorney Darling that he is willing to negotiate this claim. However we have discussed that our final offer is $100,000.” (Exhibit 40A.)
70. On June 25, 1987, Marshall wrote a claim review memo to Valade which stated, in part, “We are staying with 100,000 offer.” (Exhibit 41.)
71. On June 26, 1987, Asst. Claim Manager Sakacs wrote a claim review memo which stated only: “I agree with proposed handling.” (Exhibit 42.)
72. On September 14,1987, Valade, who had atthis point been promoted to Supervisor, wrote a claim review memo to claim representative Marie Espinosa (“Espinosa”) stating: “(1) As we discussed, we cannot have any contact with defense counsel at this time. We will committee review w/Claim Mgr. for appropriate handling. (2) Review file carefully — this is a large loss.” (Emphasis in original.) (Exhibit 44.)
73. On September 15, 1987, a file review analysis report was written, memorializing a committee review meeting attended by Claim Manager Crosby, Asst. Claim Manager Sakacs, Superintendent Marshall and Supervisor Valade, at which meeting the reserve was raised from $100,000 to $115,000. Ibis was the first increase by Aetna in the reserve since April 3, 1985. (Exhibit 45.)
74. On October 1, 1987, Espinosa wrote to Darling offering $115,000 to settle the case. (Exhibit 46.)
75. On October 6, 1987, Espinosa dictated an intermediate suit report which noted that, “an offer of $115,000 was made to Attorney Darling and he was asked to convey offer to client.” It also noted that par-ling], “will request court to remove stay on bankruptcy petition of Harrington ... in order for him to proceed with trial should his client refuse offer.” (Exhibit 46A.)
76. On October 13, 1987, Darling wrote Espinosa at Aetna informing her that his clients were declining the offer of $115,000 because they did not feel that it represented adequate compensation for their losses. (Exhibit 47.)
77. On November 24, 1987, Darling wrote Espinosa informing her that, “Since we have not been able to agree on the true value of the . . . matter, and to avoid any future misunderstanding, please be advised that any and all previous offers made on behalf of [the Ransows] are hereby withdrawn.” (Exhibit 48.)
78. On December 10, 1987, Espinosa dictated an Intermediate Suit Report which stated, in part: “. . . it now appears that his [Darling’s] clients are not prepared to settle at any price. A structured settlement was recommended and this too was rejected.” It further notes that, “Defense was being handled by the Law Offices of Vincent P. Cahalane; the contract with them has been suspended.” (Exhibit 48A.)
79. On December 21, 1987, Sakacs wrote a claim review memo which states: “(1) We have made a fair and reasonable offer and the plaintiffs counsel now states they will not settle for any price. We can only push for a trial. (2) Supt. Kelliher [Marshall] should contact Atty. Scott and have them request the return of this file from Atty Cahalane.” (Exhibit 49.)
80. On April 1, 1988, Espinosa dictated an Intermediate Suit Report which stated, in part: “[i]n a letter dated 1/4/88 Attorney Darling informed me that [the Ransows] have obtained substitute counsel... At this *356 time it is unknown who her (sic) substitute counsel is.” It further notes, “Defense is once again being handled by the Law Offices of Vincent P. Cahalane.” (Exhibit 49A.)
81. On May 4, 1988, Attorney John D. B’Smith (“B’Smith”) of the Law Offices of Johnson, Mee & May of Boston sent George Sakacs at Aetna a G.L.c. 93A demand letter on behalf of his clients, the Ransows, with a demand for the policy limit of $300,000. (Exhibit 1.)
82. Attorney B’Smith’s May 4, 1988, demand letter outlines the Ransow’s G.L.c. 93A and G.L.c. 176D complaints against Aetna: persistent undervaluing the Ransow’s injuries and losses; failing to effectuate a prompt, fair and equitable settlement when liability was reasonably clear; failing to provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement; knowing violation of G.L.c. 93A by their [Aetna’s] conduct after receipt of the Ransows’ demands; and deciding, in bad faith, not to offer a fair and equitable settlement prior to trial. (Exhibit 1.)
83. Attorney B’Smith’s May 4, 1988, demand letter further noted those injuries that his clients suffered as result of Aetna’s alleged G.L.c. 93A violations: a) loss of use of the value of a fair and equitable settlement; b) delay in settlement which prevented claimants from protecting their potential settlement from inflationary losses; c) increased costs of litigation preparation which would have been unnecessary had Aetna settled promptly; and d) other damages, direct and indirect which would occur due to continued delays or avoidance in effectuating a prompt, fair and equitable settlement of the claims. (Exhibit 1.)
84. On May 6, 1988, Attorney Cahalane wrote to George Sakacs at Aetna stating, in part: “Please note that I appeared in the Norfolk Superior Court on behalf of the above named insured [Pegurri] for a conciliation on May 3, 1988. Mr. Ransow, the plaintiff in this action, is now represented by John D. B’Smith of the firm Johnson, Mee & May. After a lengthy conciliation, the Plaintiffs demand in this case is for the policy limit with (sic) is $300,000. Please note the Plaintiff is giving us an opportunity to settle this case even though he has valued this case at $750,000. Also note that there is approximately 72% interest running on this file. I suggested several times that this is a liability case and some years ago felt that it had been terribly undervalued by Mrs. O’Neill.” (Exhibit 60.)
85. On May 26, 1988, Espinosa wrote to Attorney B’Smith as a response to his c. 93A demand letter, and noted that Aetna believed that its last offer, of $115,000, was a fair and equitable settlement and would be maintained. (Exhibit 50.)
86. On June 14, 1988, Attorney B’Smith wrote a supplemental demand for relief to Espinosa in which he indicated that he would, “extend [Aetna] another opportunity to re-evaluate the fair value of these claims” and in which he reiterated his interest in settling the claim for the policy limit of $300,000. (Exhibit 51.)
87. In his June 14,1988, supplemental demand letter Attorney B’Smith outlined his clients’ G.L.c. 93A claims against Aetna: bad faith in undervaluing R. Ransow’s injuries, lack of promptness in effectuating a settlement resulting in the Ransows’ need to pursue legal action, and bad faith denial of E. Ransow’s loss of consortium claim as a separate and valid claim. (Exhibit 51.)
88. On July 5, 1988, Espinosa wrote to B’Smith, and reiterated Aetna’s intention to maintain the $115,000 offer. (Exhibit 52.)
89. On July 30, 1988, Espinosa dictated an Intermediate suit report in which she noted, in part: “We have recently received a 93A suit. This has been referred to the Law Offices of Riley, Weafer and Gar-retson . . . Attorney Greg St. Cyr has been assigned to handle this case . . . There have been two committee reviews and the decision has been to maintain the last offer of $115,000. (Exhibit 52A.)
90. On September 15, 1988, Suffolk Superior Court allowed Aetna’s motion to stay the Ransows’ G.L.c. 93A claims until the underlying tort action had been resolved.
91. On September 26, 1988, Attorney Cahalane wrote to Sakacs at Aetna informing him, in part that, “in discussing the case with [Pegurri] I have indicated that this is a liability case and told [him] that I believe a jury will find against him and there is a possibility, which I believe is realistic, that it will be in excess of the $300,000 coverage he has. As you know there is a great deal of interest that has accrued in this matter . . . [which] . . . will increase the judgment by some seventy percent. Considering his personal exposure in this matter, Mr. Pegurri asked me to make demand on Aetna ... to pay the policy and obtain a release on his behalf.” (Exhibit 61.)
92. On October 6, 1988, a memo was written memorializing a committee review meeting, which was attended by Crosby, Sakacs, Marshall, Valade, and Espinosa. The memo indicates that the reserve was raised from $115,000 to $200,000. (Exhibit 53.)
93. Handwritten “Running Notes” made at the October 6, 1988, meeting note, in part, that: “[t]he reserve is being increased due to the 70% interest on the case. ” (Exhibit 54.)
94. On October 18, 1988, Espinosa dictated an Intermediate Suit Report which stated: ‘The ESV [estimated settlement value] of Robert Ransow’s Bodily Injury Claim is set at $200,000.” (Exhibit 61A.)
95. On November 10, 1988, Attorney Cahalane wrote to Sakacs at Aetna informing him that he had, “met with [his] client Mr. Pegurri and indicated to him that you had increased your offer to settle on his behalf to $150,000 which I conveyed to the plaintiffs attorney who summarily rejected same . .. Mr. Pegurri still feels that Aetna should settle this case for the policy limits which would resolve the entire matter including *357 the Chapter 93A litigation. My position remains the same and I believe Aetna should settle this matter for the policy limits.” (Exhibit 62.)
96. The case was tried in Norfolk Superior Court from November through November 18, 1988. A verdict was returned in the amount of $170,000 on R. Ransow’s claims, which totalled $310,686.39 with the addition of prejudgment interest and costs; and $10,000 on E. Ransow’s claim for loss of consortium, which totalled $18,313.13 with the addition of prejudgment interest and costs. (Exhibit 55.)
97. On December 14, 1988, Attorney St. Cyr filed a notice of withdrawal of appearance on behalf of Aetna for its G.L.c. 93A defense. On that same day, Attorney James L. Frederick (“Frederick”) of the firm Gallagher & Gallagher, RC. filed his notice of appearance on Aetna’s behalf in the G.L.c. 93A claim.
98. During and after the Norfolk County trial on the tort claim, Attorney Henry F. Furman (“Furman”) of Johnson, Mee & May represented the Ransows for both their tort and G.L.c. 93A claims.
99. On June 19, 1991, Attorney Furman’s motion to withdraw as counsel for the Ransows was allowed.
100. On August 6, 1991, Attorneys George C. Deptula (“Deptula”) and Joel Z. Eigerman (“Eigerman”) of the firm Berlin, Clarey, Deptula & Levee in Boston, filed a notice of appearance on behalf of the Ransows for their G.L.c. 93A claims.
DISCUSSION
The Ransows have brought this G.L.c. 93A claim under §§2 and 9(1). General Laws chapter 93A, §9(1) states, in relevant part, that; “Any person, other than a person entitled to bring an action under section eleven of this chapter, who has been injured by another person’s use or employment of any method, act or practice declared unlawful by section two or any rule or regulation issued thereunder or any person whose rights are affected by another person violating the provisions of clause (9) of section three of chapter one hundred and seventy-six D may bring an action in the superior court. . .”[5]
General Laws chapter 93A, §2(a) states, in pertinent part, that: “(u)nfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.” Whether a given practice is unfair or deceptive under G.L.c. 93A must be determined from the circumstances of each case. Loyes v. Quincy Mutual Fire Insurance Co., 7 Mass.App.Ct. 723, 726 (1979).
General Laws chapter 176D, §3(9) clarifies which acts or practices are deemed unfair or deceptive when undertaken by persons engaged in the business of insurance. The subsections of §3(9) relevant to this case are: “(f) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;” and “(g) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds.”
For the Ransows to maintain an action under G.L.c. 93A, they must show (1) a statutory violation, (2) causation,[6] (3) injury and (4) a demand letter. For the Ransows to recover double or treble damages under G.L.c. 93A, §9(3), I must be persuaded that the use or employment of the act or practice by Aetna was a willful or knowing violation of c. 93A §2 or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated §2.
The facts of this case reveal ample evidence of Aetna’s violation of G.L.c. 176D, in particular their breach of the duty imposed under G.L.c. 176D, §3(9)(f) to effectuate a prompt, fair and equitable settlement of claims in which liability has become reasonably clear. To prevail on a claim that Aetna violated G.L.c. 176D, §3(9) (f), the Ransows must prove that any single act by Aetna in the handling of their claim was part of a pattern of conduct which would be a violation of c. 176D, §3(9) (f) or that such an act is part of a pattern of unfair claim settlement practices and not an isolated act. Van Dyke v. St. Paul Fire & Marine Ins. Co., 388 Mass. 671, 676 (1983).
The Ransows have proven by the fair preponderance of the credible evidence that Aetna’s failure arose as part of a pattern of persistently undervaluing the claim, setting unreasonably low reserves, unnecessarily delaying adjustments to its evaluation of the claim, delaying almost a year in responding to the Ransows’ substantial reduction in their demand, and repeatedly failing to implement decisions taken and recommendations made by those in charge of the case for inexplicably long periods of time.
Additionally, Aetna’s rigid and formalistic approach to negotiations stands in contradiction to its statutory duty to effect prompt and fair settlement. This pattern of unfair claims settlement practices satisfies the violation element of proof for a claim under G.L.c. 93A.
Further, Aetna’s attempts to take credit for the payments made by Blue Cross/Blue Shield were without legitimate foundation, as was acknowledged by their own supervisoiy personnel. Such an action is evidence of Aetna’s bad faith dealings with the Ransows. Moreover, it has been admitted by Aetna that they exhibited bad faith in their dealings with Pegurri in not informing him of the possibility of settling within the coverage limits prior to trial. Standing alone, such breaches of an insurer’s duty to act in good faith to settle a claim brought against an insured within the policy limits provide sufficient basis for recovery under G.L.c. 93A, §9. DiMarzo v. American Mutual Ins. Co., 389 Mass. 85, 97 (1983); Murach v. Massachusetts Bonding & Ins. Co., 339 Mass. 184, 186-87 (1959). The Court in DiMarzo recognized that the failure to settle within policy limits when liability *358 is reasonably clear, thus exposing an insured to an excess liability judgment satisfied the “injury” standard for proof of damages. DiMarzo, 389 Mass. at 101-02. The standard for proof of injury or harm, which had been “loss of money or property” prior to a 1979 amendment to c. 93A, was broadened by that amendment, which recognized proof that claimants “who had been injured by" or whose “rights had been significantly affected by another person violating c. 176D, 3(9)” could establish their injury element without proof of loss of money or properly. Leardi v. Brown, 394 Mass. 151 (1985).
The requirement that a claim brought under c.93A, §9 be initiated by a demand letter has been satisfied by the two demand letters sent by Attorney B’Smith on behalf of the Ransows. A legally sufficient demand letter must give reasonable notice of the injuries suffered and the relief demanded in a manner that provides the defendant with an opportunity to review the facts and law so as to decide upon a reasonable offer of settlement. Spring v. Geriatric Authority of Holyoke, 394 Mass. 294 (1985). Taken together, the two letters contain a reasonable description of a pattern of bad faith dealings and unfair acts or practices on the part of Aetna in its handling of the Ransows’ claims. The Ransows asserted a variety of injuries allegedly suffered by them due to Aetna’s unfair acts, including loss of use of the value of a prompt settlement, protection from inflationary losses, incurring the increased costs of litigation and other damages, direct and indirect. Their demand for the limits of the policy, given the seriousness of R. Ransow’s injuries, the ongoing physical limitations resultant from his injuries and the consequential impact on E. Ransow, gave Aetna reasonable notice of the significant liability the underlying claims represented.
To prevail on their claim under c. 93A, the Ransows must show either: a causal connection between Aetna’s failure to settle and a loss of money or property and that such loss was foreseeable as a result of the failure to settle; Trempe v. Aetna Casualty & Surety Co., 20 Mass.App.Ct. 448, 457 (1985); DiMarzo, 389 Mass. at 101-02; or that Aetna’s violations caused an injury to or adversely affected them. Van Dyke, 388 Mass. at 678.
The facts in this case support a finding that Aetna’s unfair claims settlement practices proximately caused the Ransows to pursue additional litigation when they found Aetna unwilling to fairly settle their claim once liability was found to be reasonably clear. Heller v. Silverbranch, 376 Mass. 621, 627 (1978).
In November of 1986, nearly five years after the underlying shooting incident, Attorney Darling reduced his demand on behalf of the Ransows from $190,000 to $130,000 in an effort to reach a settlement of the claim. This dramatic reduction in the plaintiffs demand was not reciprocated by Aetna adjusting their offer upward; rather, Aetna decided to stick to their prior offer of $100,000, which they had originally offered on August 15, 1985. On September 15, 1987, nearly ten months after the Ransows had lowered their demand to $130,000, Aetna finally adjusted their offer upward to $115,000. This was Aetna’s first upward move in their offer since the August 15, 1985 offer of $100,000; the first increase in their offer in over two years. This does not reflect a willingness to settle but an unwillingness to recognize the seriousness of the case and a failure to consider the interest which was running on any judgment which would be reached if the case were to go to trial. Aetna’s failure to respond in a timely manner to the Ransows’ dramatic reduction in their demand in 1986, their failure to inform their insured of the Ransows’ willingness to settle their claims within the policy limits rather than proceed with a trial, and their failure to calculate the impact that statutory interest would have on any judgment reached at trial when contemplating settlement figures are all evidence of Aetna’s bad faith in dealing with these claims. Aetna should reasonably have foreseen that their failure to act in good faith would result in the Ransows seeking legal recourse through a c. 93A and c. 176D claim. The Ransows’ injury was being forced to litigate the underlying complaint in Norfolk Superior Court and pursue the instant claims.[7]
The Ransows claims are supported by the credible testimony of Richard McQuillan, an experienced insurance adjuster.[8] It was McQuillan’s opinion[9] that Aetna’s practices in setting reserves in the Ransows’ case fell below the industry standard because Aetna did not take into account the seriousness of the injury and the probability of a large jury award. McQuillan further opined that the conduct of Aetna in negotiating this claim fell below industry standards in that they did not pursue negotiations with sufficient aggressiveness and did not assign personnel of appropriate seniority to pursue negotiations. McQuillan was also of the opinion that Aetna failed to make appropriate use of the advice of the attorney it had retained to represent its insured.[10]
It was McQuillan’s further opinion that the combined value of the Ransows’ claim equaled $300,000 one to two years before trial because of inflation, increased jury awards during that period of time and the mounting interests on the claim. McQuillan opined that even if the issues of interest, inflation and increased jury awards are disregarded, Aetna still undervalued the claim in light of the serious injury R. Ransow suffered, the fact that he had suffered scarring and disfigurement and that his special damages approached $34,000.
I find that it was Aetna’s bad faith dealings and unfair claims practices which caused the Ransows to ultimately abandon their $130,000 demand and seek the full value of the policy as redress for the unfair treatment they received as result of Aetna’s knowing *359 and willful violations of their legal responsibilities under General Laws c. 93A and c. 176D.
DAMAGES
Aetna contends that R. Ransow did not suffer any damages “because he got what he demanded ($300,000) plus more.” (Defendant’s Memorandum on Damages, p.4.) I find that Aetna violated c. 93A by unfairly failing to settle the Ransows’ claims at a point in time when the liability of Aetna’s insured was clear, when the injuries of R. Ransow could be fully evaluated and while the Ransows were willing to settle within the policy limits, which they were willing to do right up until the time of trial. I further find, weighing the offer against the injury alleged by R.Ransow, that Aetna’s pre-trial offer to settle in the amount of $115,000 was not a reasonable offer. Slaney v. Westwood Auto Inc., 366 Mass. 688, 704 (1975).
Chapter 580 of the Acts and Resolves of 1989
In 1988, the time of the loss in this case, G.L.c. 93A, §9 provided that before any multiplication of damages recovery ”... shall be in the actual amount of damages ...” The Supreme Judicial Court in Bertassi v. Allstate Insurance Co., 402 Mass. 366 (1988), held that while wrongful delay in an insurer’s refusal of payment may well result in the multiplying of interest, such wrongful acts do not cause the loss for which the proceeds were originally sought. See also DiMarzo, 389 Mass. at 101, and Wallace v. American Mutual Insurance Company, 22 Mass.App.Ct. (1986).[11]
The General Court, shortly after the Bertassi decision, amended G.L.c. 93A, §9(3).[12] That amendment added the following language to paragraph 3:
For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim. (Emphasis added.)
Aetna contends that the application of Chapter 580 is prospective only and should not be considered in the calculation of damages. Aetna also contends that Chapter 580 has no application to violations of G.L.c. 93A which occurred prior to the effective date of the Act.
I do not find Aetna’s arguments persuasive. Aetna’s reasoning would leave the Ransows without a remedy and in effect nullify the legislative intent of G.L.c. 176D to penalize insurance companies which fail to pay legitimate claims and force claimants to seek redress in the courts.
I rule that the amendment did not increase the statutory duty of fair dealing owed by Aetna to the Ransows. Indeed, the change in §9 should be viewed simply as a clarification of what constitutes base damage for purpose of multiplication.[13] Commonwealth v. DeCotis, 366 Mass. 234, 245 (1974). The fact that the amendment has the effect of increasing the amount of the damages awarded in this case is immaterial since the underlying obligation to refrain from unfair insurance practice remains unchanged. See Leibovich v. Antonellis, 410 Mass. 568, 579 (1991). The Supreme Judicial Court has stated that, “It is only statutes regulating practice, procedure and evidence, in short, those relating to remedies and not affecting substantive rights, that commonly are treated as operating retroactively, and as applying to pending actions or causes of action.” Fontaine v. Ebtec Corp., 415 Mass. 319 (1993); Liquilux Gas Corp. v. Martin Gas Sales, 979 F.2d 887 (1st Cir. 1992) (whether an amendment is an alteration or merely a clarification [which can be retroactively applied] depends on a number of factors, including “the fit in language and whether the enactment follows fast on discovery of the ambiguity, as reflected in common law). Id.
Calculation of Damages
Based on the foregoing findings of facts, I find that the Ransows are entitled to the following categories of damages:[14]
1. The amount of the underlying Norfolk Superior Court judgment, that is $328,999.52.
2. The trebling of this amount, as I have found that Aetna failed to effectuate a prompt and fair settlement of the Ransows’ claim and therefore violated c. 93A and c. 176D by its knowing and willful unfair or deceptive practices, and
3. The reasonable attorneys fees[15] and costs incurred in the underlying matter and in the instant case. As regards the assessment of attorneys fees, I am obligated to consider “the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area and the amount of awards in similar cases.” Linthicum v. Archambault, 379 Mass. 381, 388-89 (1979).
ORDER
For the forgoing reasons it is hereby ORDERED that judgment enter for the plaintiffs, Robert C. Ransow and Ellen Ransow, on the G.L.c. 93A and G.L. 176D claims in the amount of $986,998.56, plus attorneys fees and costs.
Counsel for the plaintiffs have thirty days from the date of this decision to submit affidavits and documentation concerning attorneys fees and costs.

 The conciliator was appointed by a Justice of the Superior Court. The conciliator recommended that Aetna settle the claim within the policy limits.

 FLV stands for full liability value.

 CSD stands for chance of successful defense.

 GOYA is an expression used internally by Aetna personnel and stands for “Get it off your ass."

 Pegurri’s assignment to the Ransows of any claims Pegurri may have had against Aetna in relation to this matter enabled the Ransows to consolidate their complaints against Aetna for any violations which may have resulted from Aetna’s handling of their claims with those which Pegurri might separately have brought. DiMarzo v. American Mutual Ins. Co., 389 Mass. 85 (1983).

 It has been argued that the 1989 passage of c. 580 of the Acts and Resolves of 1989 effectively removed the necessity for plaintiffs to prove that their damages are causally related to the defendant’s conduct.

 General Laws c. 93A, §9 was designed to make it unprofitable for a party to ignore meritorious claims. The conduct proscribed by the statute is as much the failure to make a reasonable offer in settlement as it is the substantive violation of the statute. International Fidelity Insurance Co. v. Wilson, 387 Mass. 841, 857 (1983).

 McQuillan testified as an expert witness for the plaintiffs. McQuillan has worked in the insurance industry since 1948 when he began working for the Hartford Insurance Company. In 1950, McQuillan began to work for the Insurance Company of North America and handled workmens compensation, automobile and general liability claims. In 1954, he was in charge of an office which handled the same type of claims. In 1956, McQuillan was transferred to New Haven, Connecticut and managed an office which handled workmens compensation, automobile and general liability claims. In 1964, Mc-Quillan became the claims manager for the Boston office. He remained with the Insurance Company of North America until 1982. In 1983, McQuillan began working for CIGNA Insurance as a consultant on an almost full-time basis.

 Testimony of an expert regarding the fair settlement value of the Ransows’ claims was relevant and appropriate under the circumstances. Fishman v. Brooks, 396 Mass. 643, 648 (1986).

 The evidence at trial showed that Attorney Cahalane and his associate were diligent in trying to persuade Aetna to increase its offer, but that Aetna simply ignored their advice.

 In Wallace, the trial court found that the insurance company wrongfully failed to pay a theft claim under G.L. 93A and G.L.c. 176D. The judge doubled the amount sought. The Appeals Court reversed and held that even though the insured was wrongfully forced to litigate the claim, the damages were to be measured by the interest lost from the time the insurance company failed to pay the claim until the time of judgment.

 The amendment became effective on March 5, 1990.

 The subject amendment, Statute 1989, c. 580, §1, is entitled “An Act to Clarify Damage Under the Consumer Protection Act.” The plaintiffs have attached the “Fact Sheet” that was published by Representative William A. Vernon, the sponsor of House Bill 6014 that was ultimately enacted into law as c. 580. The Fact Sheet indicates that “This bill has been filed in reaction to confusion over treble damages in such cases . . . This bill clarifies the language so that the intent is clearer that the final award in such cases is to only be the judgment multiple by three.”
Another judge of this Court (Sweeney, J.) has given retroactive application to Chapter 580. See Herbert S. Stark and Herbert S. Stark, Inc. v. The Travellers Indemnity Company, Hampshire County C.A. No. 88-294, dated December 1991).

 The underlying judgments, before the addition of interest, were $170,000 for the plaintiff Robert Ransow, and $10,000 for the plaintiff Ellen Ransow. I find and rule that they are each entitled to the same proportionate share, in the ratio of 17 to 1, of the recovery in the present action.

 Attorney Furman has already testified regarding his legal experience and the hours he expended in representing the Ransows in the underlying case. He indicated that he expended approximately 105 hours between the time of his c. 93A letter and the conclusion of the Norfolk Superior Court case. Attorney Furman also testified that the fair value of his legal services was $200 per hour.